STATE of Wisconsin, Plaintiff-Respondent,†

v.

Robert A. MENDOZA, Defendant-Appellant.

Court of Appeals

*No. 97–0952–CR. Oral argument May 20, 1998.—Decided July 7, 1998.*

(Also reported in 584 N.W.2d 174.)

†Petition to review granted.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Michael K. Gould*, assistant state public defender, Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *Gregory M. Posner-Weber*, assistant attorney general.

Before Wedemeyer, P.J., Schudson and Curley, JJ.

CURLEY, J. Robert A. Mendoza appeals from a judgment entered by the trial court, following a jury

trial, convicting him of possession of cocaine with intent to deliver, as a second or subsequent offense, contrary to §§ 161.16(2)(b)1, 161.41(1m)(cm)3, and 161.48, STATS., 1993–94. Mendoza claims that the trial court erred by: (1) not suppressing evidence seized during an administrative search, which Mendoza claims was pretextual; (2) not suppressing evidence seized from Mendoza's car, which Mendoza claims should have been excluded under the "fruit of the poisonous tree" doctrine; and (3) removing four jurors for cause solely because they had criminal records. First, we conclude that the trial court failed to exercise its discretion by removing the four jurors for cause, solely because they had criminal records, and we also conclude that this error requires reversal of Mendoza's conviction. Second, we conclude that we cannot determine whether the administrative search was proper because the trial court did not make sufficient factual findings regarding whether the administrative search was a pretext for obtaining evidence of the violation of criminal laws. Third, we decline to address the issue of whether the evidence seized from Mendoza's car should have been excluded as the "poisoned fruit" of the administrative search, because we cannot do so without determining whether the administrative search was constitutional. Therefore, we reverse the judgment and remand to the trial court with instructions to make specific factual findings regarding whether the administrative search was a pretext to obtain evidence of the violation of criminal laws.

## I. BACKGROUND.

On June 16, 1996, Mendoza was working as a bartender at the Fast Times Tavern located at 1556 West Lincoln Avenue in Milwaukee. At approximately 12:30

a.m., six uniformed officers of the Milwaukee Police Department entered the tavern. The officers involved, Bernard Gonzales, John Belsha, Alphonzo Morales, David Kolatski, Earl Turner and Sergeant Michael R. Ziarnik, were assigned to Squad 242P, the "tavern check squad." Officer Gonzales testified at the suppression hearing that "the squad primarily deals with licensed premises, taverns, liquor stores, as well as other types of investigations such as drug dealing complaints and basically vice related offenses."

Officer Gonzales, Sergeant Ziarnik and Officer Belsha testified that they entered the tavern for the purpose of conducting a "tavern check" or "license check," and that Mendoza was told, upon arrival, that they were entering for that purpose. Officer Gonzales, however, also testified that he and the other officers conducted the tavern check because they "were receiving complaints of possible drug activity from that tavern." Officer Gonzales specifically testified that they had received complaints from other tavern owners that drug activity was occurring at the Fast Times Tavern. Sergeant Ziarnik testified that the officers had received specific information that a vehicle parked in front of that tavern had been involved in possible drug activity. Sergeant Ziarnik also testified that the officers had received complaints concerning the possibility of drug activity and prostitution at the tavern. Officer Belsha testified that, prior to entering the tavern, the officers discussed the complaints of drug dealing in the tavern, and that that information had been "shared collectively." Finally, the arrest reports made by another officer, Officer Turner, explicitly state that the officers conducted a license check of the tavern "following up on a drug dealing complaint."

When the officers entered the tavern, Mendoza and George Paulos were tending bar for two patrons sitting at the bar. Mendoza, Paulos and the two patrons were ordered to identify themselves, and Officer Belsha conducted pat-down searches of all of them. Officer Belsha did not testify as to the reason for the pat-down searches. Sergeant Ziarnik, however, testified that the patrons did "not specifically" appear to be dangerous, and Officer Gonzales testified that the patrons did not appear to be dangerous to him.

Officer Gonzales testified that he went to the back of the bar and entered a storage room. The storage room contained a large cooler, a desk and a couch. Mendoza had been temporarily storing his belongings in the storage room and sleeping on the couch at night. Officer Gonzales testified that he observed a white plastic bag containing clothing on the floor near the couch. Officer Gonzales testified that he saw another smaller bag with handles protruding from the bag of clothing. Officer Gonzales observed fireworks sticking out of the smaller bag, and then returned to the barroom and reported his discovery to Sergeant Ziarnik. Sergeant Ziarnik and Officer Gonzales then returned to the storage room with Mendoza and asked Mendoza whether the fireworks belonged to him. Mendoza admitted they were his. The officers then removed the fireworks from the bag and found a small baggie of what appeared to be cocaine at the bottom of the bag. Mendoza first denied, but then admitted, owning the cocaine.

After finding the cocaine, the officers returned to the barroom. Gonzales testified that, after searching the storage room, he returned to the front of the tavern, and checked the tavern's license. Sergeant Ziarnik and Mendoza testified, however, that Gonzales checked the

809

tavern's license prior to entering the storage room. In any event, besides checking the tavern's license, the officers apparently did not conduct any other activities in furtherance of a tavern check pursuant to § 139.08(4), STATS.

Earlier, when frisking Mendoza, the officers seized a set of keys which included the keys to the tavern's cash register and the keys to a 1985 Lincoln Town Car parked outside of the tavern. Mendoza told the officers that the car belonged to his father, but that he was using it to store his belongings. The officers requested Mendoza's consent to search the car, and eventually, approximately an hour after the police had entered the tavern, Mendoza signed a written consent form. Officers Belsha and Morales then searched the trunk of the car and discovered a bandanna tied in a knot inside a plastic bag containing clothing. Inside the bandanna, the officers found two clear plastic bags containing suspected cocaine. A test later revealed that the larger of the two bags contained 19.8 grams of cocaine.

Mendoza was arrested and charged with felony possession of cocaine with intent to deliver, as a second or subsequent offense. Prior to trial, Mendoza filed a motion to suppress the evidence seized from the storage room and the car, which the trial court denied. Mendoza was then tried before a jury. At the close of voir dire, the State moved to strike four jurors for cause solely because each had been convicted of a crime. Over defense objection, the trial court granted the motion and removed the jurors. The jury found Mendoza guilty of possession of cocaine, in violation of § 161.41(3m), STATS., 1993–94. The trial court sentenced Mendoza to twenty-four months in prison, and Mendoza now appeals.

## II. ANALYSIS.

*A. Removal for cause of jurors who had been convicted of a crime.*

We begin with Mendoza's last claim because, standing alone, it requires reversal. Following voir dire, the State moved to strike four jurors for cause, solely on the basis that each had been convicted of a crime. One of the jurors had been convicted of a misdemeanor charge in Milwaukee County earlier in the year, and three of the jurors had been convicted of felonies.[1] The State specifically argued that the fact that three of the potential jurors were convicted felons "itself is sufficient for striking those persons," and that "the status as felons has the association of perhaps a hidden agenda where they have been subject to the personality of the State's prosecution previously."[2] Mendoza's counsel objected to the State's motion to strike, and argued that the jurors' prior convictions did not "automatically disqualify them because they haven't—they haven't said anything in response to questioning during voir dire that has left any reason to doubt their ability to be fair and impartial." The trial court then granted the State's motion and struck all four jurors for cause.

---

[1] One juror had been convicted of a felony in New York two years prior to Mendoza's trial, another was convicted of a felony in Milwaukee County in 1966, and a third was convicted of a felony approximately thirty years ago in Alabama.

[2] Although the prosecutor, in these comments, only expressly referred to the three jurors who had committed felonies, he also moved to strike for cause the juror who had been convicted of a misdemeanor, arguing that he was "just very uncomfortable with that situation."

■"The question of whether a prospective juror is biased and should be dismissed from the jury panel for cause is a matter of the circuit court's discretion." *State v. Ramos*, 211 Wis. 2d 12, 15, 564 N.W.2d 328, 330 (1997) (internal quotation marks and quoted source omitted). A circuit court's discretionary decision is erroneous, however, if based on an error of law. *See id.* at 16, 564 N.W.2d at 330.

■In Wisconsin, a juror who is not indifferent in a case must be excused. Section 805.08(1), STATS. As the State concedes, however, criminal convictions do not automatically disqualify prospective jurors. *See* § 756.01, STATS. (prospective jurors must be electors of the state); § 6.03(1)(b), STATS. (persons convicted of treason, felony, or bribery cannot be electors unless their civil rights are restored); § 304.078, STATS. ("Every person who is convicted of a crime obtains a restoration of his or her civil rights by serving out his or her term of imprisonment or otherwise satisfying his or her sentence.").[3] In this case, the State did not attempt

---

[3] In response to a question raised during oral argument, Mendoza's counsel has filed materials summarizing the process of jury selection in Milwaukee County. The State does not dispute the materials. Prospective jurors are selected primarily from a list compiled by the Wisconsin Department of Transportation, although that list may be supplemented with other lists, including voter registration lists. *See* § 756.04(1) & (2)(am), STATS. Each prospective juror is mailed a questionnaire which they are instructed to fill out and return within ten days. *See* § 756.04(2)(b)1. Mendoza's counsel has submitted a copy of the juror questionnaire which is used in Milwaukee County. Question 6 on the questionnaire states, "Have you been convicted of a crime for which you are currently serving time, probation or parole?" The questionnaire states that if a prospective juror

to show that the civil rights of the three convicted felons had not been restored.[4] All four jurors were questioned as to whether their convictions would affect their ability to decide the case without prejudice or bias, and all four jurors stated that they believed they could decide the case fairly and impartially. Therefore, we conclude that the trial court failed to exercise its

---

answers "Yes" to Question 6, that individual is disqualified as a juror.

This result, however, conflicts with §§ 6.03(1)(b) & 756.01, STATS. As noted, all electors of the state who are not disqualified on another basis are qualified to serve as jurors. See § 756.01. Section 6.03(1)(b) disqualifies as electors only persons who have been convicted of treason, felony or bribery, and who have not had their civil rights restored. Therefore, a misdemeanor conviction, unless for bribery, see §§ 946.17 & 946.67, STATS., does not disqualify a prospective juror, even if the juror is still "serving time, probation or parole" because of that conviction. By disqualifying all persons convicted of *any* crime for which they are serving time, probation or parole, including persons convicted only of misdemeanors, not for bribery, the Milwaukee County jury commission's questionnaire currently being used may illegally exclude qualified jurors from juror service. Consequently, the juror questionnaire should be revised so that it complies with §§ 6.03(1)(b) and 756.01.

[4] The State argues that Mendoza had the burden to show that the jurors' civil rights had been restored, and that Mendoza waived his right to challenge their removal by not making such a showing. Prospective jurors, however, are presumed to be impartial and parties challenging jurors for cause have the burden of proving bias. See *State v. Louis*, 156 Wis. 2d 470, 478, 457 N.W.2d 484, 487 (1990). The three convicted felons would only be ineligible, as a matter of law, to serve as jurors if their civil rights had not been restored. Therefore, we conclude that the State, rather than Mendoza, had the burden to show both that the jurors had been convicted of a felony, and had not had their civil rights restored.

discretion by removing the four jurors for cause, solely because each had been convicted of a crime.

Mendoza argues that the trial court's error requires reversal of his conviction because the trial court's action interfered with his statutorily created right to an equal allotment of peremptory challenges. The State, however, argues that reversal is not required because Mendoza only had a statutorily created right to exercise four peremptory challenges, and that right was not interfered with. We agree with Mendoza and conclude that the trial court's error requires reversal.

In *Ramos*, the circuit court erroneously failed to remove a juror for cause and, as a result, the defendant used a peremptory strike to remove the juror. *Ramos*, 211 Wis. 2d at 14–15, 564 N.W.2d at 329–30. The State contended that despite the trial court's error, the defendant was not entitled to a new trial because the jury that ultimately decided his case was impartial. *See id.* at 23–24, 564 N.W.2d at 333. The supreme court, however, disagreed. First, the supreme court held that where additional jurors were impaneled and the crime charged was punishable by life imprisonment, § 972.03, STATS., gave the defendant a statutorily created right to seven peremptory challenges. *See id.* at 16–17, 564 N.W.2d at 330–31. The supreme court then held that reversal was necessary because "the use of a peremptory challenge to correct a trial court error . . . arbitrarily deprives the defendant of a statutorily granted right." *Id.* at 24–25, 564 N.W.2d at 334.[5]

In this case, the State argues that reversal is not required because, unlike the defendant in *Ramos*, Men-

---

[5] The Wisconsin Supreme Court recently declined the State's invitation to overrule its decision in *Ramos*. *See State v. Ferron*, No. 9–425-CR, slip op. at 2–2 (Wis. June 26, 1998).

814

doza was able to exercise all four of his peremptory challenges, and therefore was not deprived of any statutorily created right. Mendoza argues, however, that § 972.03, STATS., gives him the right to an equal allotment of peremptory challenges, and that that right was violated when the trial court, through its error, effectively granted the state eight, instead of four, peremptory challenges. Mendoza is correct.[6]

Whether § 972.03, STATS., creates a statutorily granted right to an equal allotment of peremptory challenges is a question of statutory interpretation, which we review *de novo. See Three & One Co. v. Geilfuss,* 178 Wis. 2d 400, 412, 504 N.W.2d 393, 398 (Ct. App. 1993). "Where the plain meaning of a statute is unambiguous, the words of the statute must be given their obvious and intended meaning." *Id.* Section 972.03 states that in felony trials of a single defendant for crimes not punishable by life imprisonment, where no additional jurors are impaneled, "Each side is entitled to *only* 4 peremptory challenges . . . ." (Emphasis added.) Conceivably, if the word "only" had not been included in the statute, it would be possible to argue that, although

---

[6] During oral argument, Mendoza also brought to our attention *State v. Chosa,* 108 Wis. 2d 392, 321 N.W.2d 280 (1982). In *Chosa,* the supreme court held that the deliberate removal of all Native Americans from the jury panel deprived the defendant of a substantial right and required reversal. *Id.* at 40–2, 321 N.W.2d at 28–6. *Chosa,* however, was an equal protection case, and by failing to make an equal protection argument at the trial level, Mendoza has waived the right to do so here. *See Wirth v. Ehly,* 93 Wis. 2d 433, 443, 287 N.W.2d 140, 145 (1980). Nevertheless, Mendoza's argument with respect to *State v. Ramos,* 211 Wis. 2d 12, 564 N.W.2d 328 (1997), does not depend on *Chosa,* and remains persuasive.

each side was entitled to four peremptory challenges, the trial court could permissibly grant one side, or both, more than four peremptory challenges. However, by using the word "only," the legislature clearly intended to limit each side to four, and only four, peremptory challenges.

■

Therefore, we conclude that § 972.03 grants each side not only the right to four peremptory challenges of its own, but also the right that the other side not be entitled to more than four peremptory challenges. Furthermore, we conclude that by erroneously granting the State's request to remove four jurors for cause, the trial court effectively granted the State four additional peremptory challenges. By effectively granting the State eight peremptory challenges, the trial court deprived Mendoza of his statutorily created right under § 972.03 that each side be "entitled to only 4 peremptory challenges." Therefore, we conclude that the trial court's erroneous removal of the four jurors requires reversal of Mendoza's conviction.

*B. Allegedly pretextual administrative search of the tavern.*

Mendoza claims that the trial court erred by denying his motion to suppress evidence seized from the storage room of the tavern during an administrative search which Mendoza argues was pretextual. Upon remand for a new trial, the admissibility of this evidence will again be at issue and, therefore, we will address it. *See Nischke v. Farmers & Merchants Bank & Trust,* 187 Wis. 2d 96, 102, 522 N.W.2d 542, 545 (Ct. App. 1994).

On review of a trial court's denial of a motion to suppress, the trial court's finding of facts will be upheld unless they are against the great weight and clear preponderance of the evidence. *State v. Williamson*, 113 Wis. 2d 389, 401, 335 N.W.2d 814, 820 (1983). Whether a search is reasonable, however, is a question of constitutional law which we review *de novo*. *State v. Guzman*, 166 Wis. 2d 577, 586, 480 N.W.2d 446, 448 (1992).

The Fourth Amendment to the United States Constitution and Article I, § 11 of the Wisconsin Constitutions proscribe unreasonable searches and seizures.[7] Although the Wisconsin Supreme Court may interpret Article I, § 11 differently than the Supreme Court interprets the Fourth Amendment, our supreme court has consistently and routinely conformed the law of search and seizure under the Wisconsin Constitution to the law developed by the United States Supreme Court under the Fourth Amendment. *Guzman*, 166 Wis. 2d at 586–87, 480 N.W.2d at 448.

---

[7] The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.

Article I, § 11 of the Wisconsin Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

██

The Fourth Amendment's prohibition on unreasonable searches and seizures applies to commercial premises, as well as to private homes. *See New York v. Burger*, 482 U.S. 691, 699 (1987); *State v. Schwegler*, 170 Wis. 2d 487, 495, 490 N.W.2d 292, 295 (Ct. App. 1992). An owner or operator of a business thus has an expectation of privacy in commercial property, which society is prepared to consider to be reasonable, and this expectation exists not only with respect to traditional police searches conducted for the gathering of criminal evidence, but also with respect to administrative inspections designed to enforce regulatory statutes. *Burger*, 482 U.S. at 699–700; *Schwegler*, 170 Wis. 2d at 495, 490 N.W.2d at 295.

██

"Generally, inspections done in the absence of a warrant are considered unreasonable under the Fourth Amendment." *Lundeen v. Wisconsin Dept. of Agric., Trade & Consumer Protection*, 189 Wis. 2d 255, 261, 525 N.W.2d 758, 761 (Ct. App. 1994). "However, unlike searches of private homes, which generally must be conducted pursuant to a warrant in order to be reasonable under the Fourth Amendment, legislative schemes authorizing warrantless administrative searches of commercial property do not necessarily violate the Fourth Amendment." *Donovan v. Dewey*, 452 U.S. 594, 598 (1981) (footnote omitted). To the contrary, warrantless administrative inspections are reasonable as long as they meet the three-pronged test created by the Supreme Court in *Donovan*. *See Lundeen*, 189 Wis. 2d at 262, 525 N.W.2d at 761 ((1) inspection must relate to a regulatory scheme that furthers a substantial governmental interest; (2) inspection must be necessary to further the regulatory

scheme; and (3) inspection scheme, in terms of the certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant).

In this case, the officers' search of the tavern was a warrantless administrative inspection authorized by § 139.08(4), STATS. Mendoza does not argue that the regulatory scheme established in Chapter 139, STATS., fails the three-pronged *Donovan* test. Instead, Mendoza argues that the administrative inspection was unreasonable because it was actually a pretext for obtaining evidence of violation of criminal laws unrelated to Chapter 139.

In *Whren v. United States*, 517 U.S. 806, 116 S. Ct. 1769 (1996), the United States Supreme Court held that the constitutional reasonableness of a traffic stop does not depend on the actual motivation of the individual officers involved. *Id.* at —, 116 S. Ct. at 1774. By so holding, the Supreme Court foreclosed any future claims that a traffic stop was unreasonable because it was conducted merely as a pretext to search for evidence of the violation of criminal laws. The Court, however, explicitly distinguished traffic stops from administrative inspections and inventory searches.[8] In so doing, the Court noted that it had previously observed, in *Burger*, in upholding the constitutionality of a warrantless administrative inspection, that the search "did not appear to be 'a 'pretext' for obtaining evidence of . . . violation of . . . penal laws.' " *Whren*, 517

---

[8] "An inventory search is the search of property lawfully seized and detained, in order to ensure that it is harmless, to secure valuable items (such as might be kept in a towed car), and to protect against false claims of loss or damage." *Whren v. United States*, 517 U.S. 806, — n.1, 116 S. Ct. 1769, 1773 n.1. (1996).

U.S. at —, 116 S. Ct. at 1773 (quoting *Burger*, 482 U.S. at 716–17 n.27). In *Whren*, the Court also acknowledged that, in *Florida v. Wells*, 495 U.S. 1, 4 (1990), it had stated that " 'an inventory search must not be used as a ruse for a general rummaging in order to discover incriminating evidence,' " (footnote omitted), and that in *Colorado v. Bertine*, 479 U.S. 367, 372 (1987), in approving an inventory search it had thought it significant that "there had been 'no showing that the police, who were following standard procedures, acted in bad faith or for the sole purpose of investigation.' " *Whren*, 517 U.S. at —, 116 S. Ct. at 1773. The Court then explained that although these cases did not endorse "the principle that ulterior motives can invalidate police conduct that is justifiable on the basis of *probable cause* to believe that a violation of law has occurred[,] . . . the exemption from the need for probable cause (and warrant), which is accorded to searches made for the purpose of inventory or administrative regulation, *is not accorded to searches that are not made for those purposes.*" *Id.* at —, 116 S. Ct. at 1773 (emphasis added). Therefore, unlike a traffic stop situation, because administrative inspections are not supported by probable cause, they will not be reasonable if, instead of being conducted for the purpose of enforcing a regulatory scheme, they are conducted as a pretext for obtaining evidence of other criminal laws. *See also People v. Scholten*, 529 N.E.2d 796, 798–99 (Ill. Ct. App. 1988) (reaching same conclusion based on Supreme Court case law prior to *Whren*).[9]

---

[9] We note that in *United States v. Nechy*, 827 F.2d 1161 (7th Cir. 1987), the Seventh Circuit Court of Appeals reached a different result, holding that an administrative search of a Milwaukee pharmacy was lawful even though the officer's ulterior purpose was to search for evidence of a criminal violation.

In the instant case, the trial court failed to make factual findings concerning whether the officers' purpose in conducting the administrative inspection of the tavern was to enforce the regulatory scheme found in Chapter 139, STATS., or whether the inspection was a pretext to search for evidence of the violation of criminal laws. The trial court did make a finding that § 139.08(4), STATS., gave the officers the authority to enter the premises to conduct an administrative inspection, and that the officers had the right to enter the storage room pursuant to that administrative inspection. That fact, however, is not contested on appeal. What is contested is whether the officers' actual purpose in conducting the inspection was to check the tavern's compliance with the provisions of Chapter 139, or whether the officers' real purpose was to search for evidence of the violation of criminal laws. The trial court failed to make factual findings regarding this issue.

There is evidence in the record which supports either conclusion. For example, the officers involved

---

*See id.* at 116–7. *Nechy*, however, involved a search conducted pursuant to a warrant which was issued under 21 U.S.C. § 880. Additionally, although the Seventh Circuit found that Nechy's case came "within the general rule that if a search is objectively reasonable, the motives of the officers conducting it will not turn it into a violation of the Fourth Amendment," *id.* at 1167, in *Whren*, the Supreme Court explicitly noted that it had never held "that an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment . . . *outside the context of inventory search or administrative inspection.*" *Whren*, at —, 116 S. Ct. at 1774 (emphasis added). In light of the Supreme Court's pronouncement in Whren, we decline to apply the Seventh Circuit's holding in *Nechy* to this case.

were assigned to the "tavern check squad," but this squad, according to Officer Gonzales, not only inspected taverns for compliance with Chapter 139, STATS., but also dealt with "investigations such as drug dealing complaints and basically vice related offenses." The officers testified that their purpose in searching the tavern was to conduct a "license check," and that Officer Gonzales checked the bar's license, either before or after searching the storage room. The officers' also testified, however, that they searched the tavern because they had received complaints of drug and prostitution activity at the bar, and because they had received information that the car parked in front of the bar had been involved in drug activity. This testimony was corroborated by the statements in the police reports indicating that the officers conducted the search, "following up on a drug dealing complaint."

"When an appellate court is confronted with inadequate findings and the evidence respecting material facts is in dispute, the only appropriate course for the court is to remand the cause to the trial court for the necessary findings." *Wurtz v. Fleischman*, 97 Wis. 2d 100, 108, 293 N.W.2d 155, 159 (1980). Therefore, upon remand, if the case will be retried, we direct the trial court, after examining the evidence, and taking additional testimony if necessary, to decide Mendoza's suppression motion after making findings of fact regarding whether the officers' administrative inspection of the tavern was a pretext to search for evidence of the violation of criminal laws.

C. *Exclusion of evidence seized from the car as "poisonous fruit."*

Mendoza also claims that the trial court erred by not suppressing evidence found in a car parked outside

the tavern, which Mendoza claims should have been excluded under the *Wong Sun*[10] "fruit of the poisonous tree" doctrine. "The primary concern in attenuation cases is whether the evidence objected to was obtained by exploitation of a prior police illegality or instead by means sufficiently attenuated so as to be purged of the taint." *State v. Anderson*, 165 Wis. 2d 441, 447–48, 477 N.W.2d 277, 281 (1991). Mendoza claims that the evidence found in the car was obtained by exploitation of: (1) the unconstitutional search of the tavern; and (2) the unconstitutional frisk of the employees and patrons of the tavern.

The State concedes that the frisks of the employees and patrons of the tavern were clearly unconstitutional. A frisk of an individual who has been detained for questioning is only justified when the officer reasonably believes that the individual may be armed and dangerous to the officer or others. *Terry v. Ohio*, 392 U.S. 1, 30 (1968); *Williamson*, 113 Wis. 2d at 400–01, 335 N.W.2d at 819–20. In the instant case, no officer testified that he believed that any of the frisked individuals were armed and dangerous. To the contrary, the officers testified that the people who were frisked did not appear to be dangerous. Therefore, the frisks were unconstitutional.

As stated previously, however, we are not able to determine the constitutionality of the search of the tavern without further factual findings. Therefore, we are not able to determine whether the evidence seized from the car should have been excluded under the *Wong Sun* "fruit of the poisonous tree" doctrine.

---

[10] *See Wong Sun v. United States*, 371 U.S. 471 (1963).

### III. CONCLUSION.

In sum, we conclude that the trial court erred by removing four jurors from the panel, solely because each had been convicted of a crime. Further, we conclude that this error requires reversal, because it deprived Mendoza of a statutory right. Due to a lack of factual findings, we are not able to determine the constitutionality of either the search of the tavern, or the search of the car parked outside of the tavern. Therefore, upon remand, if the case will be retried, we direct the trial court, after examining the evidence, and taking additional testimony, if necessary, to decide Mendoza's suppression motion after making factual findings regarding whether or not the administrative inspection of the tavern was conducted as a pretext to search for evidence of the violation of criminal laws.

*By the Court.*—Judgment reversed and cause remanded with instructions.